IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO

| | | |
|---|---|---|
| WESTERN WATERSHEDS PROJECT, | ) ) ) ) | Civ. No. 04-443-E-BLW |
| Plaintiff, | ) ) | |
| v. | ) ) ) | MEMORANDUM DECISION and ORDER |
| DAVID ROSENKRANCE, Field Manager, Challis Field Office, Bureau of Land Management and BUREAU OF LAND MANAGEMENT, | ) ) ) ) ) ) ) ) | |
| Defendants. | ) ) | |

## INTRODUCTION

The Court has before it summary judgment motions filed by plaintiff WWP, defendant BLM, and intervenor L&W Stone.  The Court heard oral argument on April 19, 2005, and the motions are now at issue.  For the reasons expressed below, the Court will require the BLM to prepare an EIS, but will reserve ruling on the request for injunctive relief.

## FACTUAL BACKGROUND

Plaintiff WWP challenges the BLM's approval of the expansion of a flagstone mining operation known as the Three Rivers Quarry, operated by intervenor L&W Stone.  WWP contends that the BLM's approval was arbitrary and capricious under the Administrative Procedures Act (APA) because the approval failed to follow the requirements of NEPA and FLPMA

The Quarry was started in the 1970s to mine flagstone, a decorative rock used in the construction industry.  It is situated on public lands managed by the BLM pursuant to the 1999 Challis Resource Management Plan ("Challis RMP").

In those early days, the BLM limited the Quarry to a five-acre site. During an inspection in 1991, however, the BLM discovered that the operators had expanded the Quarry to 16 acres.  The BLM issued a Notice of Noncompliance and required the operators to file a Plan of Operations (POO) so that the BLM could prepare an Environmental Assessment (EA) of the expanded site.

The POO described the area of impact as 16.3 acres, and stated that "[t]he operation is expected to last for 5 years" or less.  *AR at 2309.*  The POO proposed to mine three quarry sites sequentially.  *AR at 2310.*  The first site would be mined and then reclaimed before moving on the second site, and so on.  *AR at 2310.*  The reclamation would involve backfilling or pulling down high walls, "or both," and

**Memorandum Decision & Order – page 2**

then covering the quarry sites "with enough fines and topsoil so that regeneration of vegetation will occur." *AR at 2310.*

In evaluating this reclamation proposal, the EA states that "[u]pon successful reclamation of the projects, the only residual impact will be an improved visual impact and a slight lessening of sediment from the site." *AR at 2306.* While the EA recognizes that the mining will irreversibly alter outcrop patterns, it concludes that "[u]pon final reclamation, these changes should be essentially unnoticeable." *AR at 2306.*

After reviewing the EA, the BLM approved the POO in 1992, by issuing a Record of Decision (ROD) and Finding of No Significant Impact (FONSI). In the ROD, the BLM concluded that the reclamation will "result in an overall improvement of the environment." *AR at 2291.* The ROD required that future expansion be approved by the BLM. *AR at 2292.*

The BLM later described the POO that it approved as "16.3 acres of surface disturbance; a five year or less operation; sequential mining of three quarries (each quarry backfilled, covered with fines and soil, and reseeding [sic] before development of the next quarry) . . . . " *AR at 2929.* With this reclamation, the BLM concluded, "the site would be returned to a near-natural condition." *AR at 4187*

**Memorandum Decision & Order – page 3**

The 1992 ROD and FONSI contained other requirements, but three are key to this case: (1) the approved area of impact was 16.3 acres; (2) the three quarry sites would be filled in, covered with soil, and reseeded; and (3) future expansion would require BLM approval.

L&W Stone took over the Quarry in 1996.  Each year between 1993 and 2000, the BLM inspected the Quarry and determined that it was in compliance with the POO.  *See Second Declaration of Gardner*, ¶ 15, p. 5.

By 2002, however, the Quarry had expanded to 50 acres, and BLM's Field Manager Renee Snyder concluded that "[t]he present operations do not conform to the approved plan of operations."  *AR at 2929.*  Snyder described two pits that now existed on the site.  One pit (known as Pit 1) covered the area proposed for the three quarries, and another pit (Pit 2) covered additional ground.  The BLM directed L&W Stone to file a new plan of operations containing information on the feasibility of fully reclaiming the site.

L&W Stone submitted its revised POO on December 20, 2002, proposing to expand the Quarry to 165.9 acres.  *See Second Declaration of Gardner* ¶ 16, p. 5. The BLM put the revised POO on its website, and held a public meeting on February 24, 2003, to solicit comments on the revised POO.  *AR at 3124.*  The BLM had not yet prepared an EA on the revised POO, and so the meeting was

**Memorandum Decision & Order – page 4**

limited to a discussion of the revised POO.

On October 29, 2003, BLM geologist Ken Gardner observed in a memo to BLM Field Manager Renee Snyder that "abundant waste rock was side cast on the north slopes of Pit 1 to the point where it is no longer economically feasible to reclaim Pit 1." *AR at 4187-88.* He concluded that this expansion was "clearly outside the terms and conditions of the approved [POO]," because "[t]he development of the pits has progressed to the point where the pits cannot economically be reclaimed per the approved reclamation plan." *AR at 4188.*

In June of 2004, the BLM prepared a new EA based on the revised POO. *AR at 5724.* L&W Stone proposed increasing the size of the mine to 166 acres and its duration to 40 years. Under the proposed action, "Pit 1 and Pit 2 would be left in their final mining configurations (no recontouring or revegetation)." *AR at 5750.*

The EA also evaluated two alternatives. Alternative 1 limited the mine to its current size of 60 acres and required a full reclamation pursuant to the 1992 ROD and FONSI. *AR at 5750.* Alternative 2 fell between Alternative 1 and the proposed action. While Alternative 2 contained mitigation measures not included in the proposed action, it did not require full reclamation. Instead, it states that "[w]hen practicable, reclamation of all areas undergoing surface disturbance would

**Memorandum Decision & Order – page 5**

occur during and following completion of specific mining operations." *AR at 5754.* Other reclamation efforts were to be done if "feasible." *Id.*

On July 29, 2004, the BLM issued a ROD and FONSI, selecting Alternative 2. The BLM rejected Alternative 1, stating that it "would require reclamation to a standard that cannot now be economically implemented." *AR at 5727.*

All sides have filed motions for summary judgment asking the Court to resolve as a matter of law the issue whether the BLM should have prepared an EIS. The Court will resolve that issue after setting forth the standard of review.

## ANALYSIS

### 1.   <u>Standard of Review</u>

An agency's decision not to prepare an EIS under NEPA is reviewed under the APA's arbitrary and capricious standard. *Idaho Sporting Congress v. Thomas*, 137 F.3d 1146 (9th Cir. 1998). In determining whether the BLM's decision was arbitrary and capricious, the Court must ask whether the agency has taken a "hard look" at the environmental consequences of its proposed action. *Blue Mountains Biodiversity Project v. Blackwood,* 161 F.3d 1208, 1211 (9th Cir. 1998). Under this deferential standard, the Court will affirm an agency's decision that is "fully informed and well-considered." *Id.*

### 2.   <u>NEPA Requires Public Input</u>

**Memorandum Decision & Order – page 6**

NEPA regulations describe the EA as a "concise public document." *See* 40 C.F.R. § 1508.9. The regulations tell agencies that "public scrutiny [is] essential." 40 C.F.R. § 1500.1(b). Accordingly, agencies are charged to "encourage and facilitate public involvement in decisions," *id*. § 1500.2(d), so that "environmental information is available to public officials and citizens before decisions are made." *Id*. § 1500.1(b).

The Ninth Circuit has read these regulations to mean that "the public must be given an opportunity to comment on draft EAs and EISs." *Anderson v. Evans,* 314 F.3d 1006, 1016 (9th Cir. 2002). Because the regulations "must mean something," the Circuit has held that an agency's failure to obtain any public input on an EA "violates these regulations." *Citizens for Better Forestry v. U.S. Dept. of Agriculture*, 341 F.3d 961, 970 (9th Cir. 2003).

Here, the BLM obtained no public input on the EA before issuing the FONSI. While a public meeting was held, it was devoted entirely to a discussion of the revised POO because no draft EA had yet been completed. The BLM thus violated NEPA by issuing a FONSI without obtaining any public input on the EA.

3.      **NEPA Requires Data to be in the EA**

The Supreme Court has held that NEPA "guarantees that the relevant information will be made available to the larger [public] audience." *Robertson v.*

**Memorandum Decision & Order – page 7**

*Methow Valley Citizens Council*, 490 U.S. 332, 349 (1989).  The EA must

"provide the public with a basis for evaluating the impact" of the proposed

action.  *Thomas*, 137 F.3d at 1150.  Accordingly, the hard data supporting the

FONSI must be either (1) found in the EA itself, or (2) contained in the

administrative record and referred to by the EA.  *Blue Mountains,* 161 F.3d at

1214.

      In *Blue Mountains*, an environmental group claimed that the Forest

Service's EA contained no hard data to support its conclusion that increased

sedimentation from logging would not harm fish habitat.  The Forest Service

argued that the hard data was included in the administrative record.  The Circuit

responded as follows:

> We do not find adequate support for the Forest Service's decision in
> its argument that the 3,000 page administrative record contains
> supporting data.  The EA contains virtually no references to any
> material in support of or in opposition to its conclusions.  That is
> where the Forest Service's defense of its position must be found.

*Id*. at 1214.

      Here, the FONSI relied in part on an analysis of the economic feasibility of

Alternative 1.  That analysis was not contained in the EA, or provided to the public

in any way before the FONSI was issued.[1]  Thus, if the public had been allowed to

comment on the EA, it would have had no way of knowing why the BLM's

preferred alternative was not requiring the full reclamation previously mandated by

the 1992 ROD and FONSI.

**4.     Conclusion on Sufficiency of EA Under NEPA**

The BLM violated NEPA by failing to obtain any public input on the EA

before issuing the FONSI, and by failing to include in the EA a discussion of the

feasibility analysis the agency relied on in rejecting Alternative 1.  Accordingly,

the 2004 ROD and FONSI, based on an insufficient EA, are arbitrary and

capricious under the APA.

**5.     Is an EIS Required?**

The Court could remand this matter to the agency to prepare an EA that

accords with NEPA.  WWP argues, however, that an EIS is necessary.

NEPA requires that an environmental impact statement (EIS) must be

prepared for every "major federal action significantly affecting the quality of the

human environment."  42 U.S.C. § 4332(2)(C).  If an agency decides not to prepare

an EIS, it must supply a "convincing statement of reasons" to explain why a

---

[1]  The feasibility analysis was discussed in a draft EA, *see Second Declaration of Gardner*, but that draft was never disseminated to the public, and the analysis was dropped in the final EA.

**Memorandum Decision & Order – page 9**

project's impacts are insignificant. Save the *Blue Mountains*, 161 F.3d at 1212.

"The statement of reasons is crucial to determining whether the agency took a

'hard look' at the potential environmental impact of a project." *Id.*

To prevail on a claim that an agency violated its statutory duty to prepare an

EIS, a "plaintiff need not show that significant effects will in fact occur." *Id.* It is

enough for the plaintiff to raise "substantial questions whether a project may have

a significant effect" on the environment. *Id.*

In making this determination, the Court relies on NEPA regulations,

promulgated by the Council on Environmental Quality ("CEQ"), to guide the

review of an agency's determination of "significance." *See* 40 C.F.R. § 1508.27;

see also *Marsh*, 490 U.S. at 372 (CEQ regulations entitled to substantial

deference).

Whether there may be a significant effect on the environment requires

consideration of two broad factors: "context and intensity." *See* 40 C.F.R. §

1508.27; 42 U.S.C. § 4332(2)(C). Context refers to the setting in which the

proposed action takes place. *Id*. at § 1508.27(a). Intensity means "the severity of

the impact." *Id*. at § 1508.27(b).

These regulations contain a non-exclusive list of ten factors that the Court

may consider in determining the intensity issue. The Ninth Circuit has held that

**Memorandum Decision & Order – page 10**

one of these factors may be sufficient to require preparation of an EIS in appropriate circumstances. *Ocean Advocates v. U.S. Army Corp of Engineers*, 402, F.3d 846 (9th Cir. 2005).

**6.      Unique Characteristics of the Geographic Area**

Under these regulations, the Court may consider the "[u]nique characteristics of the geographic area such as proximity to . . . wild and scenic rivers, or ecologically critical areas." *Id*. at 1508.27(b)(3).   Here, the EA states that "portions of the proposed operations are within the Wild and Scenic River corridors of the East Fork Salmon River and the Salmon River." *AR at 5772.* While these rivers have not yet been formally designated as Wild and Scenic Rivers, they are eligible, and are being considered, for inclusion. *Id.*  The Challis RMP requires that the rivers be managed to "maintain the level of development that resulted in the river segment's tentative [Wild & Scenic River] classifications and to ensure non-degradation of outstandingly remarkable values." *Id.*

In addition, a map accompanying the 2004 EA shows that Pit 1 will intrude into an Area of Critical Environmental Concern (ACEC). *AR at 5803.*  The ACEC is defined in FLPMA as an area "within the public lands where special management attention is required . . . to protect and prevent irreparable damage to important historic, cultural, or scenic values . . . ." *See* 43 U.S.C. §§ 1702(a),

**Memorandum Decision & Order – page 11**

1712(c)(3).

The Quarry is also located within a Class II Visual Resource Management Area ("Class II VRM").  The Challis RMP's management objective for the Class II VRM is to

> design proposed alterations so as to retain the character of the landscape. The level of change to the characteristic landscape should be low. Management activities may be seen, but should not attract the attention of the casual observer.  Any changes must repeat the basic elements of form, line, color, and texture found in the predominant natural features of the characteristic landscape.

This discussion shows that the Quarry lies in an environmentally sensitive area.  Each one of these designations – Wild & Scenic Rivers (eligible), ACEC, and Class II VRM – emphasizes the protection of scenic values.  Yet the Quarry is now becoming so large that full reclamation is no longer feasible.  This raises a substantial question whether the scenic values protected by these designations will be affected by a 166 acre Quarry operating for 40 years that cannot be fully reclaimed.

**7.    <u>Uncertainty</u>**

Another of the "intensity" factors is "[t]he degree to which the possible effects on the human environment are highly uncertain . . . ."  40 C.F.R. § 1508.27(b)(5).  Here, the BLM rejected Alternative 1, meaning that it is willing to accept something less than full reclamation.  Just how much less is "highly

**Memorandum Decision & Order – page 12**

uncertain."  The reclamation under Alternative 2 is to be done "when practicable."

Other reclamation efforts are to be done only if "feasible."  These undefined terms

are highly malleable.   Given the huge costs of reclamation estimated by the

BLM's geologist Ken Gardner, *see Second Declaration of Gardner*, tying

reclamation to terms like "practicable" and "feasible" causes great uncertainty as to

how much reclamation will take place.

**8.**     **Conclusion on Significance**

The discussion above shows that the context and intensity of the proposed

action raise questions about whether it is significant.  While questions regarding

one of the factors may be enough to trigger the preparation of an EIS, here there

are questions regarding two of the factors. *Ocean Advocates v. U.S. Army Corp of

Engineers*, 402, F.3d 846 (9th Cir. 2005).

However, the Court's concerns transcend any scorecard accounting.  The

Quarry lies in an environmentally sensitive area, where scenic values are given

high priority.  The mining requires large pits on an exposed ridge.  The Quarry's

size has increased to the point where it is no longer feasible to fully reclaim the

site, and the reclamation that is required is not clearly defined.

WWP does not have to prove that the expanded Quarry will have a

significant affect on the environment.  They need only raise "substantial questions"

**Memorandum Decision & Order – page 13**

concerning its significance.  *Id.*

Expanding the Quarry to 166 acres on an exposed ridge for 40 years without clear reclamation requirements in an area where scenic values are protected raises substantial questions as to whether that expansion will have a "significant" affect on the environment.  The EA fails to contain "convincing reasons" otherwise, *Blue Mountains*, 161 F.3d at 1212, rendering arbitrary and capricious the BLM's decision not to prepare an EIS.  Accordingly, the Court will order the BLM to prepare an EIS on the revised POO.

**9.    Injunctive Relief**

In the NEPA context, "irreparable injury flows from the failure to evaluate the environmental impact of a major federal action."  *High Sierra Hikers Assoc. v. Blackwell*, 390 F.3d 630, 641 (9th Cir. 2004).  While an injunction does not automatically issue upon a finding that an agency violated NEPA, "the presence of strong NEPA claims gives rise to more liberal standards for granting an injunction."  *Id*.  If environmental injury is sufficiently likely, the balance of harms will usually favor the issuance of an injunction to protect the environment.  *Id*.

Here, serious environmental concerns are arrayed against substantial commercial interests.  The same dilemma was faced in *High Sierra*.  There, the district court had to determine whether commercial packers in two wilderness areas

**Memorandum Decision & Order – page 14**

should be enjoined from operating while the Forest Service completed an EIS.

The court "crafted a fair and balanced injunction that provided for interim relief for the environment pending compliance with NEPA and did not drastically curtail the packers' operations." *Id*. at 642-43. "After briefing from all sides on the needed remedy, the district court adopted a combination of remedies that were proposed by the parties at the hearing and in post-hearing submissions." *Id*. at 643.

Some type of injunction must issue in this case – the environmental concerns demand it. How broad that injunction should be, however, is a more difficult question. It is the Court's understanding that the Quarry is not expanding to 166 acres at this time, pending resolution of this litigation. One option is to enjoin any expansion, but allow current mining operations to proceed until the EIS is completed. Such an injunction, like the one issued in *High Sierra*, would recognize commercial interests yet still protect the environment.

At any rate, there is substantial room for the parties to negotiate and compromise. The Court finds that it may be productive to give the parties some time to discuss the scope of the injunction. At the very least, if no agreement can be reached, the parties can submit proposals for injunctive relief, and the Court can craft its own injunction much as the district court did in *High Sierra*.

The Court will therefore give the parties thirty days to discuss the scope of

**Memorandum Decision & Order – page 15**

the injunction.  At the end of that time, the parties shall either submit a stipulation to the Court on the scope of the injunction, or submit competing proposals for injunctive relief.

## ORDER

In accordance with the Memorandum Decision set forth above,

NOW THEREFORE IT IS HEREBY ORDERED, that the motion for summary judgment (docket no. 53) filed by plaintiffs is GRANTED IN PART, AND RESERVED IN PART.  It is granted to the extent that it seeks to require the BLM to prepare an EIS on the revised POO submitted by L&W Stone Corporation. It is reserved to the extent it seeks injunctive relief.

IT IS FURTHER ORDERED, that the motions for summary judgment (docket nos. 52 & 54) filed by L&W Stone and the BLM, respectively, are DENIED.

IT IS FURTHER ORDERED, that the parties shall submit to the Court, within thirty (30) days from the date of this decision, either a stipulation on the scope of an injunction or, if no agreement can be reached, proposals for an injunction.  The Court will review those submissions and enter injunctive relief accordingly.

DATED:  **May 6, 2005**

B. LYNN WINMILL
Chief Judge
United States District Court